IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARC QUINT,                          )
                                     )
                Plaintiff,           )
                                     )
        v.                           )        Civil Action No. 11-116
                                     )
THAR PROCESS, INC.,                  )
                                     )
                Defendant.           )

## MEMORANDUM OPINION

Pending before the Court is a motion to dismiss Plaintiff's Amended Complaint filed by Defendant Thar Process, Inc. ("Thar"), pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 11.) Defendant argues that Plaintiff's complaint alleging wrongful termination, violation of the whistle-blower provision of the federal False Claims Act, and breach of contract fails to satisfy the pleading requirements set forth in Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937 (2009).  For the reasons that follow, Defendant's motion is denied as to Count I and granted as to Counts II and III.

## I.    INTRODUCTION

### A.    Factual History[1]

Defendant Thar Process, Inc., is a Pennsylvania corporation located in Harmarville, Pennsylvania.  Thar's specialty

---

[1]  Unless otherwise noted, the facts in this section are taken from the Amended Complaint and construed in favor of Plaintiff.

is development of "supercritical fluid technology and equipment operations."  When the events giving rise to Plaintiff's claims began, Marc Quint, a mechanical engineer with more than 20 years' experience, was living in Dexter, Michigan.  Sometime around July 2009, Plaintiff and a Thar representative began discussions about him coming to work for the company.  After its initial offer was rejected because of insufficient salary, Thar offered Mr. Quint a position as a full-time Senior Mechanical Engineer at its Harmarville location at an annual salary of approximately $108,000.  Plaintiff accepted this offer on October 5, 2009, and officially began working for Thar on October 19, 2009.

Mr. Quint's work involved use of a supercritical pressure vessel used in the production of spices and other products ("the pressure vessel") which had had been designed and manufactured by Thar sometime in 2002-2003.  When Plaintiff went to work for Thar, the company was in the midst of a multi-year project to develop production of diesel-grade biofuel from plants, which was funded in part through a grant from the Advanced Technology Program of the National Institute of Standards and Technology ("NIST"), a division of the U.S. Department of Commerce.  (See Exh. A to Memorandum in Support of Defendant's Motion to Dismiss, Doc. No. 12, "Def.'s Memo.")  The project involved a continuous extraction process in which the pressure vessel was an essential component.

2

Within two days after beginning work with Thar, Mr. Quint realized that the pressure vessel did not meet the requirements of the American Society of Mechanical Engineers ("ASME") or the Pennsylvania Boiler and Unfired Pressure Vessel Law of 1998, 35 P.S. §§ 1331.1-1331.19 ("the PA Pressure Vessel Law.")  Specifically, Mr. Quint noticed that no code stamp[2] was affixed to the equipment; he immediately pointed out this omission to Chief Executive Officer Lalit Chordia and Vice President/General Manager Jose Martinez.  He told Mr. Chordia the pressure vessel never should have been operated because it was not hydro-tested or code-stamped as required by Pennsylvania law.  Mr. Chordia stated he was unaware of the lack of a code-stamp; when he questioned Mr. Martinez, he admitted there was no stamp.  Plaintiff explained to both supervisors that operation of the equipment failed to meet the standards of the NIST Advanced Technology Program and that he viewed Thar's conduct as "outright fraud."  (Amended Complaint, Doc. No. 8, "Am. Compl.," at 27-28.) Mr. Quint later talked with the company's Director of Engineering, B.K. Desai, who had designed the continuous extraction system for

---

[2]  Plaintiff's use of the phrase "code stamp" or "code stamping," seems to be a reference to that portion of the PA Pressure Vessel Law which provides in relevant part:  "Every. . .pressure vessel destined for use in this Commonwealth shall be inspected during its construction by an individual who has a valid national board commission to perform an inspection.  Every. . .pressure vessel which has been so inspected shall, upon completion, have placed upon it a stamp bearing a symbol and number authorized by the [Pennsylvania] Department [of Labor and Industry] for this purpose."   35 P.S. § 1331.7.  Shop inspection.

3

Thar, and explained that the pressure vessel did not meet ASME criteria for stress levels, wall thickness, and other requirements. Mr. Desai responded that he "wanted no further involvement with the project" and told Plaintiff "not to worry" about the ASME violations. (Am. Compl., ¶ 12.)

Mr. Martinez subsequently asked Plaintiff to pursue having the pressure vessel code-stamped as required by ASME and the PA Pressure Vessel Law.[3]  Mr. Quint proceeded to complete the tasks necessary to meet the requirements, but could not satisfy one critical issue, namely, being able to trace the materials used in the construction of the vessel from the material supplier to the machining vendor and back to Thar.  Because Thar had apparently not properly identified each material used in each component as it was built, this "traceability" requirement could not be met, effectively ruling out any possibility that the equipment could be legally operated in Pennsylvania.  When Mr. Quint advised Mr. Martinez of this fact, Mr. Martinez asked him on at least three separate occasions to falsify records showing that the pressure vessel complied with the applicable laws.  Plaintiff refused.

Neither Mr. Martinez nor Mr. Chordia took any further steps to bring the pressure vessel into compliance and Plaintiff was directed

---

[3]   It appears that a vessel which has not been inspected and approved during construction can be retroactively approved if some 13 requirements are met. *See* 35 P.S. § 1331.7(b).

to continue using it.  He reluctantly did so under protest, but complained to Mr. Martinez "at least a couple times a month throughout the time of his employment" about the situation.  (Am Compl., ¶ 17.) He also complained occasionally to Mr. Chordia, who told him to work out the problem with Mr. Martinez, his direct supervisor.

As a result of these complaints, Mr. Martinez and Mr. Chordia prevented Plaintiff from reviewing paperwork for other pressure vessels and from using the Thar computer network drive which contained information Mr. Quint needed about other vessels he thought violated the ASME code.  Furthermore, after Mr. Quint learned Thar had filed reports with federal agencies about the pressure vessel, he began reviewing those reports in an effort to stop Thar from misappropriating federal funds.  Mr. Quint hesitated to contact the Pennsylvania Department of Labor, ASME, NIST or any other state or federal authority because he feared his job would be terminated if he did.  That fear became reality when on September 8, 2010, Thar terminated Mr. Quint's employment.

B.   Procedural History

Plaintiff filed suit on January 28, 2011, and Defendant moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6).  (Doc. No. 4.)  In response, Plaintiff filed an Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B), in which he stated three claims against Thar:

Count I    wrongful termination in violation of public
           policy as set forth in the PA Vessel Law and the
           Pennsylvania Health and Safety Act, 43 P.S. §§
           25-1 to 25-15;[4]

Count II   violation of the federal False Claims Act,
           specifically 31 U.S.C. § 3730(h)(1)and (2); and

Count III  breach of his employment contract with Thar.

Defendant filed its current motion to dismiss all three counts
on June 22, 2011.  The parties having fully briefed the motion, it
is now ripe for decision.

     C.  Jurisdiction and Venue

Mr. Quint is a resident of the State of Michigan and
Defendant is a corporation with its principal place of business in
Pennsylvania.  This Court therefore has jurisdiction based on
complete diversity of the parties and, according to the Amended
Complaint, an amount in controversy in excess of the statutory
minimum.  See 28 U.S.C. § 1332(a)-(c).  Venue is appropriate in this
Court under 28 U.S.C. § 1391(a) because the events giving rise to
Plaintiff's claims occurred in Allegheny County, Pennsylvania.

## II.  STANDARD OF REVIEW

In the aftermath of Bell Atl. Corp. v. Twombly, 550 U.S. 544
(2007), Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 173 L. Ed.

---

[4]  Plaintiff appears to have abandoned his reliance in Count I on violation
of the Pennsylvania Health and Safety Act because in the brief in opposition
to the motion to dismiss, he concedes that an employee does not state a
wrongful discharge claim when he alleges he was discharged for reporting
violations of that statute.  (Plf.'s Brief at 13.)

2d 868 (2009), and the interpretation of those two cases by the Third Circuit Court of Appeals, the pleading standards which allow a complaint to withstand a motion to dismiss pursuant to Rule 12(b)(6) have taken on slightly new parameters.  The standard is now whether the complaint includes "sufficient factual matter to show that the claim is facially plausible."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009); see also Twombly, 550 U.S. at 555, holding that a complaint which offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  The Fowler court further directed that in considering a motion to dismiss, the district court should undertake a two-part analysis:

> First, the factual and legal elements of a claim should be separated.  The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to show such an entitlement with its facts. As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader is entitled to relief."

Fowler, 578 F.3d at 210-211 (quotations and citations omitted.)

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

7

Iqbal, 129 S. Ct. at 1949; see also Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009), and Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010). "Determining whether a complaint states a plausible claim for relief will. . .be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 361 (3d Cir. 2010), quoting Iqbal, 129 S. Ct. at 1950. A complaint should not be dismissed even if it seems unlikely the plaintiff can prove the facts alleged in the complaint or will ultimately prevail on the merits. The Twombly pleading standard "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." McTernan v. City of York, 564 F.3d 636, 646 (3d Cir. 2009) (internal quotations omitted.)

## III. ANALYSIS

### A.   Count III - Breach of Employment Contract

We begin our analysis with Count III of the Amended Complaint in order to resolve the question of Mr. Quint's employment relationship with Thar before we address the issue of whether his employment was wrongfully terminated as he claims in Count I.

1. *Plaintiff's claims*:  In Count III, Plaintiff alleges that sometime around July 2009, Thar contacted him about a job opening

8

and began negotiating the conditions of his potential employment. During the course of those negotiations, and before any final agreement was reached, Mr. Chordia purportedly told Mr. Quint, "If you are a good engineer, you will have a job here for life." (Am. Compl., ¶ 39.) Mr. Quint alleges that based on this statement by the president of the company and an increase in the salary offer of almost $30,000, he accepted Thar's offer on October 5, 2009. According to Mr. Quint, the offer letter dated September 24, 2009 (see Exh. A to Am. Compl., "the Offer Letter"), contained six clauses which reflect Thar's intention that Plaintiff would be employed in Pittsburgh "for many years," specifically:

- a provision concerning pension contributions by the company;
- clauses regarding compensation for moving expenses; and
- a provision precluding termination in the first year of employment except for cause.

(Am. Compl., ¶¶ 41-42.)

Plaintiff relied on these provisions in the Offer Letter and Mr. Chordia's statement in deciding to accept the job, commute from Michigan to Pittsburgh for six months, and list his home in Michigan for sale, all of which were detrimental to him. He further contends that the Offer Letter is an employment contract which provided that he was not "a mere employee-at-will," but one who could be terminated only for just cause. (Am. Compl., ¶ 50.) Thar breached this

9

contract by terminating his employment, without cause, on September
8, 2010.

      2.  *The parties' arguments:*  Thar argues that Mr. Quint
has failed to state a claim for breach of contract for four reasons:
(1) Plaintiff's subsequent execution of a written agreement in the
Thar employee handbook acknowledging his at-will employment status
defeats his claim that the Offer Letter was a contract of employment
"for many years;" (2) the Offer Letter and the purported promise of
an indefinite period of employment were insufficient as a matter of
law to create an employment contract; (3) Mr. Chordia's alleged
verbal promise is barred by the parol evidence rule; and (4) Plaintiff
has failed to plead a necessary element for establishing an
implied-in-fact employment contract, that is, additional
consideration. (Def.'s Memo at 13-16.)

    In response, Mr. Quint argues that the terms in the Offer Letter
created an employment contract for an implied term.  In particular,
he points to a provision in the Offer Letter which pertains to
reimbursement of relocation expenses if he were "dismissed for cause
within one year from the start of [his] full-time work at the
Company's Pittsburgh office" and references to increasing
contributions to the company's pension plan.  Secondly, he provided
additional consideration sufficient to overcome the presumption of
at-will employment. Finally, he was the victim of a "bait-and-switch"

maneuver by Defendant because he accepted the position based on the contract of employment expressed in the Offer Letter, and only learned of the "at-will" provision in the employee handbook after the contract was agreed to by both parties. (Brief in Opposition to Defendant's Motion to Dismiss, Doc. No. 13, "Plf.'s Brief," at 19-23.)

3. *Discussion and conclusion:* Because we find no employment contract was created by either Mr. Chordia's statement or by any provision of the Offer Letter, Count III will be dismissed.

To state a claim for breach of contract under Pennsylvania law,[5] a plaintiff "must establish: '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003), *quoting* CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). The focus here is on the essential terms of the alleged contract, specifically its duration. As both Mr. Quint and Thar acknowledge, Pennsylvania law recognizes the doctrine of "at-will" employment, meaning either

---

[5]     The parties assume, and the Court agrees, that a court sitting in diversity applies the substantive law of the state in which it sits. *See* Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); Edwards v. HOVENSA, LLC, 497 F.3d 355, 361 (3d Cir. 2007). When applying Pennsylvania substantive law, if there is no controlling decision by the Pennsylvania Supreme Court, this Court will consider decisions of intermediate appellate courts, which, although not conclusive, are indicative of how the Supreme Court might decide the issue. McGowan v. Univ. of Scranton, 759 F.2d 287, 291 (3d Cir. 1985) (such decisions may constitute "presumptive evidence" of Pennsylvania law.)

party may end the relationship at any time.    Geary v. United States Steel Corp., 319 A.2d 174, 176 (Pa. 1974).   Consequently, in most instances, an employee has no cause of action when his employment is terminated.   *See* Nix v. Temple Univ., 596 A.2d 1132, 1135 (Pa. Super. Ct. 1991) (the employment of an at-will employee in the private sector "can be terminated for good reason, bad reason, or no reason at all.")   It has long been established in Pennsylvania that generally speaking, an employer "may discharge an employee with or without cause, at pleasure, unless restrained by some contract." Spierling v. First Am. Home Health Servs., 737 A.2d 1250, 1252 (Pa. Super. Ct. 1999), *quoting* Henry v. Pittsburgh & Lake Erie Railroad Company, 21 A. 157, 157 (Pa. 1891).   The presumption of at-will employment can only be overcome if the plaintiff-employee can establish the existence of an express contract or an implied-in-fact contract.   Dugan v. Bell Tel., 876 F.Supp. 713, 726 (W.D. Pa. 1994), *citing* Scott v. Extracorporeal, Inc., 545 A.2d 334, 338-339 (Pa. Super. Ct. 1988).

To rebut the presumption of at-will employment, the plaintiff "must establish one of the following:   (1) an agreement for a definite duration; (2) an agreement specifying that the employee will be discharged for just cause only; (3) sufficient additional consideration; or (4) an applicable recognized public policy exception."   Luteran v. Loral Fairchild Corp., 688 A.2d 211, 214 (Pa.

12

Super. Ct. 1997); *see also* Rutherfoord v. Presbyterian-University Hospital, 612 A.2d 500, 503 (Pa. Super. Ct. 1992) (the burden of proving one is not employed at-will "rests squarely" with the employee.)  We consider the first three of these possibilities in light of the facts presented in Plaintiff's Amended Complaint; the fourth situation is addressed in the following section.

a.  An agreement for a definite duration:  To the extent Plaintiff contends that Mr. Chordia's statement, "If you are a good engineer, you will have a job here for life," established an employment contract, such a claim must fail as a matter of law.  Under long-standing Pennsylvania law, a promise of "permanent" or "lifetime" employment is too vague to establish a contract.  *See* Seiss v. McClintic-Marshall Corp., 188 A. 109, 109 (Pa. 1936) ("Alleged contracts of life employment are. . .so unusual as to have been, with rare exceptions, condemned by the courts as unreasonable and unauthorized.")  *See also*, Murray v. Commercial Union Ins. Co., 782 F.2d 432, 435 (3d Cir. 1986) (summary judgment was properly granted to the defendant as a matter of law where the plaintiff's breach of contract claim was based on assurances of a "future and lifetime career" and employment "for as long as I wanted and they wanted me and I was satisfactory to them," because such statements did not create an agreement of employment for a specific term); and Scott, 545 A.2d at 336-337 (promise of "a permanent job" and

13

references in the company personnel handbook to "permanent employment status" did not rebut the presumption of at-will employment.) In fact, even more precise statements such as verbal assurances that the plaintiff would be working for the defendant-employer "for at least two years" or that the plaintiff would be employed "as long as he performed [his duties] satisfactorily" are not considered sufficiently definite to overcome the at-will presumption. *See*, respectively, Marsh v. Boyle, 530 A.2d 491, 494 (Pa. Super. Ct. 1987), and Braun v. Kelsey-Hayes Co., 635 F. Supp. 75, 77 (E.D. Pa. 1986).

Plaintiff acknowledges  -- in a backhand manner --  that the Offer Letter did not create an agreement that he would be employed for a definite period. (Plf.'s Brief at 20, stating "Defendant intended for Mr. Quint to work in Pittsburgh *for many years*.") Despite this statement, Plaintiff argues that two clauses in the Offer Letter establish a contract of an implied term and that he was not an at-will employee. During the course of negotiations, it had become obvious that Mr. Quint was unable or unwilling to immediately relocate from Michigan to Pennsylvania. The Offer Letter therefore provided that during the first 24 weeks of his employment, Mr. Quint would be able to work alternate weeks at his home in Michigan and at the Harmarville location. Then, beginning "on the date that is no longer than twenty five weeks after your start date with the

14

Company," he would be required to work full-time in Pittsburgh. (Offer Letter at 2.)  Plaintiff contends that this provision shows he was to be employed for a period not less than one year.  (Plf.'s Brief at 21.)

Even an extraordinarily generous reading of this portion of the Offer Letter anticipates that Mr. Quint would be employed at least 25 weeks, not a year; in that case, Mr. Quint has no cause of action because his employment was terminated in September 2010, well after 25 weeks had elapsed.  However, this arrangement is described in the letter as a "benefit" in addition to compensation, not as a guarantee of employment for a definite period.  Moreover, it was subject to reconsideration on a monthly basis, i.e., "you may work outside the Company's Pittsburgh office and telecommute on a regular basis, provided that: . . .You, your manager and corporate management of the Company agree to the continuation of this temporary arrangement on a monthly basis."  (Offer Letter at 2.)

Nor are we persuaded that the discussion of annual corporate contributions to Plaintiff's pension plan created a contract of employment for a definite period.  The Offer Letter provides that Mr. Quint would be entitled to participate in a company-sponsored retirement program.  Plaintiff relies on the following statement as evidence that his employment contract was for a period of at least three, if not five, years:

15

>The Company will match 1% to 3% of your salary up to the
>limit of the investment in a 5-year period.  The Company
>is required by plan definition to match employee
>contributions at 3% for three of the five years.  The
>remaining two years are set at the Company's discretion.

(Offer Letter at 2.)

These sentences appear in a paragraph captioned "Retirement
Benefit."  Nothing in that paragraph offers, much less guarantees,
employment for three or five years; the sentences merely state what
the Company "is required by plan definition" to contribute if the
employee chooses to participate in the retirement plan.

    b.  An agreement specifying termination will only be
for just cause:  "The modification of an 'at-will' relationship to
one that can never be severed without 'just cause' is such a
substantial modification that a very clear statement of an intention
to so modify is required."  Schoch v. First Fidelity Bancorporation,
912 F.2d 654, 660 (3d Cir. 1990), quoting Veno v. Meredith, 515 A.2d
571, 578 (Pa. Super. Ct. 1986).  "Courts are highly reluctant to make
definite that which the parties themselves failed to do."
Darlington v. General Elec., 504 A.2d 306, 312 (Pa. Super. Ct. 1986)
o'ruled on other grounds, Clay v. Advanced Computer Applications,
Inc., 559 A.2d 917 (Pa. 1989).

Plaintiff argues that the following clause of the Offer Letter
expressly provides that he could not be terminated except for cause,
at least during the first year of his employment:

16

> If you voluntarily leave the Company or are dismissed for
> cause within one year from the start of your full-time work
> at the Company's Pittsburgh office, you will return all
> monies that the company paid on behalf of you for your
> relocation.

(Offer Letter at 3.)

Again, even the most generous reading of this sentence cannot turn it into an offer of employment that can be terminated only for cause. The sentence simply sets out two instances applicable during the first year in which Mr. Quint would be required to return all monies the company paid for his relocation to Pittsburgh: (1) if he voluntarily terminated his employment or (2) if he were dismissed for cause.[6] Nothing in this sentence **precludes** him from being dismissed "for cause," e.g., for poor performance or failure to perform his assigned duties, within a year or at any other time; it only limits the time period during which he must reimburse the company. That is, if he were dismissed through no fault of his own during the first year after he began working in Pittsburgh, he would not be required to make the reimbursement. Such a condition cannot be found to be a "very clear statement" that Thar intended to hire

---

[6] The Court assumes that the phrase "within one year from the start of your full-time work at the Company's Pittsburgh office" applies to both conditions. Although it appears adjacent to the second condition, common business experience would tend to make the reader believe that if the employee worked for Thar for more than one year before voluntarily resigning, he would not be required to reimburse the company for his moving expenses. This distinction is not critical to the analysis, however, since Plaintiff relies on the one-year time period as it pertains to the "dismissal for cause" phrase.

Mr. Quint under a contract that could only be terminated for cause.

           c.    <u>Sufficient additional consideration</u>:    In determining if an implied contract intended to override the presumption of at-will employment has been formed, "a court will find 'additional consideration' when an employee affords his employer a substantial benefit other than the services which the employee is hired to perform, or when the employee undergoes a substantial hardship other than the services which he is hired to perform." <u>Darlington</u>, 504 A.2d at 315. Pennsylvania courts generally construe the "additional consideration" factor narrowly and require the plaintiff to show an "extraordinary benefit or detriment." <u>Kane v. Platinum Healthcare LLC</u>, CA No. 10-4390, 2011 U.S. Dist. LEXIS 7398, *11 (E.D. Pa. Jan. 25, 2011). Even if the plaintiff can show the additional consideration, the court will consider whether the period of time he was employed was "reasonable," that is, was it "commensurate with the hardship the employee has endured or the benefit he has bestowed." <u>Kane</u>, id., *see also* <u>Veno</u>, 515 A.2d at 580. Generally, determining whether the purported additional consideration is sufficient to rebut the presumption is a question of fact for the jury. <u>Scullion v. EMECO Indus., Inc.</u>, 580 A.2d 1356, 1358 (Pa. Super. Ct. 1990). However, the court may address such issues of fact where the "evidence is so clear that no reasonable man would determine the issue before the court in any way but one."

Martin v. Safeguard Scientifics, Inc., 17 F. Supp.2d 357, 369 (E.D.
Pa. 1998), *quoting* Darlington, 504 A.2d at 312.

Plaintiff argues that he provided sufficient additional
consideration to overcome the presumption of at-will employment,
specifically (1) his relocation to Pittsburgh, part-time from
October 2009 through April 2010, then full-time thereafter, and (2)
his wife's relocation of her work to Pittsburgh, requiring him to
also relocate despite his termination by Thar.  He relies on the case
of Cashdollar v. Mercy Hosp. of Pittsburgh, 595 A.2d 70 (Pa. Super.
Ct. 1991), in which the court affirmed a jury decision that found
the plaintiff had provided sufficient additional consideration to
overcome the at-will presumption when he sold his home in Virginia
and moved his family to Pittsburgh, only to be terminated 16 days
later.

The facts of Cashdollar are slightly different from those
outlined by Plaintiff in his own case.  There, the jury found that
the plaintiff had experienced greater hardships than those incurred
by most salaried professionals when changing jobs, specifically, he
gave up a secure job as the vice president of human resources at a
hospital in Virginia for a salary increase of just over 10%,
"uprooted" his pregnant wife and two-year-old child, and sold his
home "based on his understanding that he was going to a job where
his special talents would be employed."  Id., 595 A.2d at 73.

Instead, he was fired just two weeks later because he was allegedly "creating an unstable working environment in the Human Resources Department" at Mercy Hospital. Id. at 71.

By contrast, we find the facts of this case similar to those of Pinderski v. Commonwealth Tel. Enters., Inc., CA No. 05-2657, 2006 U.S. Dist. LEXIS 50783 (M.D. Pa. July 25, 2006). There, the plaintiff who lived in Chicago accepted a position with a company in Wilkes-Barre, Pennsylvania. When he accepted the offer, his wife resigned from her job at which she was earning $123,000 plus bonuses, stock options, profit sharing and other benefits. Less than a month after he began working for the defendant, he was told he would be terminated because he was not a "good fit," with the company, meaning he did not have the proper experience or credentials, even though the employer had reviewed his resume, interviewed him, and conducted reference checks before hiring him. Id. at *1-*2. Pinderski sued for wrongful discharge and alleged he had undergone considerable hardship to accept the position with the defendant and that he could therefore only be discharged for good cause. Id. at *6. The court held that the fact that his wife had given up her job and substantial benefits could not be attributed as consideration given by the plaintiff himself. Moreover, the fact that he had expended time and money preparing to move himself and his family from Chicago to Wilkes-Barre was not additional consideration when he did not sell

his previous home, buy a new home or actually move his family to Pennsylvania.  Rather, preparing for such a move was no more than a detriment that is "commensurate with those incurred by all manner of salaried professionals."  Id. at *7-*10.

Here, Plaintiff has alleged that for the first six months of his employment, he commuted between Pennsylvania and Michigan and for some time afterward, continued to commute back to Michigan almost every weekend.  (Am. Compl., ¶¶ 43-44.)  He "listed his house on the market in Michigan starting in February 2010, fully intending to sell it and move to Pittsburgh."  (Id., ¶ 45.)  His wife relocated her employment to Pittsburgh, "still routinely commutes to Pittsburgh" and her car still has Pennsylvania license plates.[7]  Because of his wife's new employment, Mr. Quint needs to sell his home in Michigan and relocate to Pittsburgh.  (Id., ¶¶ 47-48.)  Like the court in Pinderski, we find none of the actions **Mrs**. Quint is alleged to have undertaken constitute consideration by her husband.  Secondly, the fact that he commuted between Pittsburgh and Michigan for six months was part of the original agreement and Mr. Quint acknowledges he did not agree to relocate until he was offered a higher salary.  It appears the commuting arrangement was made to accommodate Mr. Quint, not to bestow any benefit on the Company.  Moreover, the Offer Letter

---

[7]    It is unclear to the Court why, if Plaintiff's wife has relocated her employment to Pittsburgh, she still regularly commutes to Pittsburgh, or the significance of where her car is registered.

stated he would receive compensation for his travel expenses during the first six months and there is no allegation that he did not receive it, so he suffered no financial detriment by having to pay commuting costs himself.   Commuting to Michigan on weekends after the first six months similarly appears to have been for his own personal benefit, not that of the company, and there is no allegation to support the conclusion that this was a substantial detriment to him. He did not sell his home in Michigan, merely listed it for sale. Finally, unlike Cashdollar, he was not terminated only a few days after beginning his new employment but rather almost a year later.

We conclude Plaintiff has failed to establish the sufficiency of any additional consideration to overcome the at—will presumption, nor has he established a contract for a definite period of time or identified an agreement that would preclude him being dismissed except for cause during his first year of employment.   The breach of contract claim in Count III is therefore dismissed.

B.   Count I - Wrongful Termination

1.   *Plaintiff's claims:*   Plaintiff alleges in Count I that he repeatedly advised Thar management that continued operation of the pressure vessel was a violation of the PA Pressure Vessel Law because it had never been hydro-tested and approved by the ASME; the vessel could not be retroactively approved because Thar had failed to maintain records regarding the traceability of the materials used

in its construction; he was asked at least three times by Mr. Martinez
to falsify records to show that the pressure vessel was in compliance;
and, despite his continuing protests to both Mr. Chordia and Mr.
Martinez about the non-compliance of the pressure vessel, he was
forced "to continue to engineer, improve, modify and operate the
vessel in violation of the codes and laws. . .and in a manner that
endangered the safety of Defendant Employer's employees, including
Plaintiff."   (Am. Compl., ¶¶ 11, 13-15, and 19.)   His subsequent
termination "was in direct opposition to the public policy of the
Commonwealth of Pennsylvania as articulated in the PA Pressure Vessel
Law."   (Id., ¶ 23.)

        2.   *The parties' arguments:*   Thar argues that Plaintiff
has failed to state a claim for wrongful termination in Count I
because the claim is founded on the PA Pressure Vessel Law which has
never been recognized as the basis for an exception to at-will
employment.   The law imposes no legal duty on Plaintiff to report
the events surrounding Thar's continued use of the pressure vessel,
a necessary element in finding a statutory basis for a public policy
violation, and it does not embody a "well-defined, universal
sentiment regarding a matter of great public concern."   Thar
contends there are only three public policy exceptions to the at-will
employment doctrine in Pennsylvania:   the employer (1) cannot
require an employee to commit a crime; (2) cannot prevent an employee

from complying with a statutorily imposed duty; and (3) cannot discharge an employee when specifically prohibited from doing so by statute.   Plaintiff has failed to plead facts sufficient to satisfy any of these exceptions.   Specifically, neither of the statutes that Plaintiff identifies in the Amended Complaint – the Pennsylvania Health and Safety Act and the federal Occupational Health and Safety Act ("OSHA") – creates an exception to the presumption of at-will employment.   (Def.'s Memo at 1–6.)

Plaintiff responds that Thar is missing the point – he does not claim that either the Pennsylvania Health and Safety Act or OSHA creates an exception to the presumption of at-will employment. Rather, his contention is that Thar forced him to commit a crime when he was directed to continue operating a pressure vessel he firmly believed was not in compliance with the PA Pressure Vessel Law.   He does not argue that the law itself creates a public policy exception, only that the statute identifies as a crime the actions Thar compelled him to take.   Thus, the facts of his case, and the basis for his wrongful termination claim, fit squarely into the first public policy exception identified by Pennsylvania courts.   (Plf.'s Brief at 7–13.)

3.   *Discussion and conclusion:*   As can be seen from the discussion in the previous section, Pennsylvania courts have been reluctant to limit the scope of the at-will employment doctrine.

24

This hesitancy applies even when presented with the fourth recognized exception, violation of established public policy. As the Third Circuit Court of Appeals has observed, "Pennsylvania courts have construed the public policy exception to at-will employment narrowly, lest the exception swallow the general rule." Fraser v. Nationwide Mut. Ins. Co., 352 F.3d 107, 111 (3d Cir. 2003); see also Clay, 559 A.2d at 918 (exceptions to the at-will doctrine "have been recognized in only the most limited of circumstances, where discharges of at-will employees would threaten clear mandates of public policy"); and McLaughlin v. Gastrointestinal Specialists, Inc., 750 A.2d 283, 287 (Pa. 2000) ("An employee will be entitled to bring a cause of action for a termination of [the at-will] relationship only in the most limited of circumstances where the termination implicates a clear mandate of public policy in this Commonwealth.")

To state a cause of action under the public policy exception to the at-will doctrine, a plaintiff "must point to a clear public policy articulated in the constitution, in legislation, an administrative regulation, or a judicial decision" which is "applicable directly to the employee and the employee's actions." Hunger v. Grand Cent. Sanitation, 670 A.2d 173, 175 (Pa. Super. Ct. 1996). The Pennsylvania Supreme Court has identified the sources of public policy in this Commonwealth as "our own Constitution, court

decisions and statutes promulgated by our legislature."
McLaughlin, 750 A.2d at 288. In Fraser, the Court of Appeals noted
that although the perimeters of the public policy exception have not
been precisely defined, there appear to be only "three limited
circumstances in which public policy will trump employment at-will."
Fraser, 352 F.3d at 111, quoting Hennessy v. Santiago, 708 A.2d 1269,
1273 (Pa. Super. Ct. 1998). As the parties acknowledge, the Hennessy
court[8] described those circumstances as: "[A]n employer (1) cannot
require an employee to commit a crime, (2) cannot prevent an employee
from complying with a statutorily imposed duty, and (3) cannot
discharge an employee when specifically prohibited from doing so by
statute." Hennessy, 708 A.2d at 1273, quoting Shick v. Shirey, 691
A.2d 511, 513 (Pa. Super. Ct. 1997) (en banc), rev'd on other grounds,
716 A.2d 1231 (Pa. 1998). Moreover, the Pennsylvania Supreme Court
has held that in order for the public policy exception to apply, the
alleged violation must be of Pennsylvania public policy, not solely
an alleged violation of federal law. McLaughlin, 750 A.2d at 289
("[A] Plaintiff must do more than show a possible violation of a

[8]   We note that the Pennsylvania Supreme Court has not adopted or rejected
the three exceptions set out by the Superior Court in Shick and Hennessy,
although the high court did recognize in Shick that there may be "exceptions
to the general rule that there is no common law cause of action against
an employer for dismissal of an at-will employee where the dismissal would
threaten clear mandates of public policy."   Shick, 716 A.2d at 1234,
further noting that it had "not yet addressed the public policy exceptions.
. . and do not reach those issues today."   Id. at 1234, n.3.

federal statute. . . [and] in some way must allege that some *public policy* of *this* Commonwealth is implicated, undermined, or violated.") (Emphasis in original.)   Thus, even if Mr. Quint had relied on violation of a federal statute such as OSHA (which we agree he did not in his Amended Complaint), such a violation, standing alone, would not establish a public policy exception under Pennsylvania law.   *See*, for example, <u>Kelly v. Ret. Pension Plan for Certain Home Office, Managerial & Other Emples. of Provident Mutual</u>, No. 02-3185, 2003 U.S. App. LEXIS 18481, *2-*3 (3d Cir. Sept. 5, 2003) (plaintiff's claims failed where he alleged that the employer's marketing methods violated Rule 10b-5 of the Securities and Exchange Act of 1984), and <u>McGonagle v. Union Fid. Corp.</u>, 556 A.2d 878, 885 (Pa. Super. Ct. 1989) (wrongful termination claim by in-house attorney who refused to approve mailings which he believed violated unspecified insurance laws of other states failed because even if he were correct, such actions did not violate Pennsylvania public policy.)

We need not discuss the second and third <u>Hennessy</u> exceptions because Plaintiff clearly limits his argument to the first.   He argues he was required to commit a crime in violation of the PA Pressure Vessel law when Thar insisted that he continued to "engineer, improve, modify and operate the vessel."   In his brief, he also argues indirectly that Mr. Martinez asked him to commit a

27

crime by falsifying records to indicate that the pressure vessel was in compliance with Pennsylvania law, but this is not explicitly alleged as a crime in the Amended Complaint.

When invoking the "commit a crime" exception, the plaintiff must point to his employer's course of action that is "clearly illegal." Kelly, 2003 U.S. App. LEXIS 18481 at *2. "Pennsylvania will not recognize a wrongful discharge claim when an at-will employee's discharge is based on a disagreement with management about the legality of a proposed course of action unless the action the employer wants to take actually violates the law." Clark v. Modern Group Ltd., 9 F.3d 321, 327-328 (3d Cir. 1993). Therefore, where such claims have succeeded, the plaintiff has identified a specific policy or law violated by the employer's actions. See, e.g., Woodson v. AMF Leisureland Centers, Inc., 842 F.2d 699, 702 (3d Cir. 1988) (employee wrongfully terminated for refusing to serve visibly intoxicated person in violation of 47 P.S. § 4-493(1)); Novosel v. Nationwide Ins. Co., 721 F.2d 894, 900 (3d Cir. 1983) (employee's discharge for refusing to participate in the defendant's lobbying efforts was held to concern his right, under the Pennsylvania constitution, to political expression and termination was therefore in violation of public policy); Perks v. Firestone Tire & Rubber Co., 611 F.2d 1363 (3d Cir. 1979) (dismissal for refusal to take a polygraph test violated public policy since such testing, as a

condition of employment, was prohibited by 18 Pa. C.S.A. § 7321(a));

Brennan v. Cephalon, Inc., CA No. 04-3241, 2005 U.S. Dist. LEXIS

25170, *18-*21 (D. N.J. Oct. 25, 2005) (case survived motion to

dismiss where discharged plaintiff alleged that had he complied with

his employer's directive to change his audit report, he would have

engaged in illegal conduct in violation of several false reporting

statutes, including 18 Pa. Cons. Stat. Ann. § 4911);[9] Levito v.

Hussman Food Service Co., CA No. 89-5967, 1990 U.S. Dist. LEXIS 145,

*4-*9 (E.D. Pa. Jan. 8, 1990) (plaintiff survived motion to dismiss

where he claimed he was wrongfully terminated for refusing to engage

in an illegal kick-back scheme in violation of 18 Pa. C.S. § 4104);

Dugan, 876 F.Supp. at 725 and n.11 (motion to dismiss denied where

employee alleged he was fired when he refused to release records

subpoenaed as part of an official investigation because he believed

his employer wanted to destroy them, an act which was unlawful under

several Pennsylvania statutes); Kroen v. Bedway Security Agency, 633

A.2d 628, 633 (Pa. Super. Ct. 1993) (see Perks, supra); Reuther v.

Fowler & Williams, Inc., 386 A.2d 119, 121-122 and n.6 (Pa. Super.

Ct. 1978) (raising the possibility that his supervisor had incited

terminated employee to commit perjury when called for jury duty, in

---

[9] This case was later dismissed at summary judgment for lack of evidence
to support the plaintiff's claim because no one in a position of authority
could be shown to have given him instructions to falsify his audit reports.
Brennan, 2007 U.S. Dist. LEXIS 33991 (D. N.J. May 8, 2007), aff'd, 2008
U.S. App. LEXIS 21120 (3d Cir. Oct. 7, 2008).

violation of Pa. R. Crim. P. 1106(b)); and Spriegel v. Kensey Nash Corp., 28 Pa. D. & C. 4th 326, 329-330 (Pa. Com. Pl. 1995) (summary judgment denied where employee argued he was wrongfully terminated for refusing to perform animal studies in violation of federal and state law.)

Here, Plaintiff relies on, and clearly identifies in his Amended Complaint, the provisions in the PA Vessel Law which he claims Thar insisted that he violate, specifically, Section 7 which requires either pre-installation inspection and approval of pressure vessels or retroactive approval of a vessel which has not been shop inspected. (Am. Compl., ¶ 11, 13-14.)   Plaintiff has also alleged that Section 18 of the statute makes it a criminal offense to violate the provisions of the statute or the regulations promulgated under it. (Id., ¶ 8.)   Penalties for the first violation include a fine and/or imprisonment for up to ten days, with increasing penalties for subsequent violations.   35 P.S. § 1331.19.   Mr. Quint has adequately alleged that Thar management required him to commit a crime by maintaining and operating the pressure vessel without the appropriate approval and certificate of operation.

Although he does not argue that his employment was terminated **because** he refused to comply with the directives of Mr. Martinez to continue operating the equipment in violation of the law, he does allege that he was terminated because he continued to complain about

30

having to do so. *Compare* Martinez v. Rapidigm, Inc., No. 07-2274, 2008 U. S. App. LEXIS 18683, *15-*17 (3d Cir. Aug. 28, 2008) (attorney-plaintiff could not show she was wrongfully discharged even if signing certain immigration petitions may have violated the Pennsylvania Rules of Professional Conduct and perjury laws because she was not required to sign the petitions, was instructed not to sign anything that "made her uncomfortable," and did not demonstrate that any of the petitions in question were unlawful.)

We find Plaintiff's allegations in support of Count I are sufficient to state a claim for wrongful discharge in violation of public policy and will allow this claim to proceed.

C.   Count II – Termination in Violation of the FCA

1.   *Plaintiff's claims:*  In the Amended Complaint, Mr. Quint alleges that Thar defrauded the federal government of some $2 million of grant monies in developing the pressure vessel and the continuous extraction system.  The effort was fraudulent, according to Plaintiff, because the pressure vessel could not work in the continuous extraction process and was "basically a big expensive 'boat anchor.'" (Am. Compl., ¶ 27.)  Thar "blatantly misrepresented" the capabilities of the extraction system to the funding agency and failed to meet technical milestones and dates.  Mr. Quint told Thar management that operation of the pressure vessel was in violation of the NIST Advanced Technology Program because the vessel did not

31

comply with the PA Pressure Vessel Law and the extraction process itself failed to meet the federal standards of the program. Moreover, when he became aware that Thar had filed reports about the pressure vessel and the continuous extraction process, he started reviewing those reports in an "effort to stop Thar from misappropriating federal funds." (Id., ¶ 32.) Due to the hostile reactions he received when he confronted management about the problems with the vessel, he was discouraged from contacting federal authorities, and did not do so because he was afraid of losing his job. Thar's decision to fire him in September 2010 was a violation of the False Claims Act ("FCA") since it was a retaliatory action against an employee who was preparing a report to the federal government about potential false claims.

2. *The parties' arguments:* Thar argues that Plaintiff cannot sustain a claim for relief under the FCA for two reasons: first, he fails to plead facts which demonstrate that his alleged reports to Thar's upper management should be considered "protected conduct" as that term is defined in the FCA, and second, Thar management had no knowledge of any acts which would arguably constitute protected conduct. Moreover, even if Thar failed to achieve success in the program funded by NIST, such a failure does not constitute fraud under the FCA. (Def.'s Memo at 6-13.)

32

Mr. Quint argues that contrary to Defendant's assertions, he did, in fact, engage in "protected conduct" by bringing his concerns about possible fraudulent conduct to the attention of Thar management, specifically by identifying the fact that the pressure vessel could not work in a continuous extraction process.   He raised concerns that Thar was either omitting or misrepresenting information to the federal government and, in response, his employment was terminated.   The issue is not whether the research and development funded by the federal government was successful, it is whether Thar misrepresented the technical capabilities of the pressure vessel when seeking federal funds, thereby defrauding the government. (Plf.'s Brief at  13-17.)

            3.    *Discussion and conclusion:*   Section 3730(h) of the False Claims Act provides in relevant part:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section. . .shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h).

To establish that an employer has retaliated against an employee who has filed (or has given the employer reason to believe he is about to file) a *qui tam* action alleging that the employer has presented false or fraudulent claims for payment by the United States

33

Government, the plaintiff must satisfy a two-prong test:  he must show "(1) he engaged in protected conduct (i.e., acts done in furtherance of an action under § 3730) and (2) that he was discriminated against because of his protected conduct."  United States ex rel. Hefner v. Hackensack Univ. Medical Ctr., 495 F.3d 103, 110 (3d Cir. 2007), quoting Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 186 (3d Cir. 2001), cert. denied, 536 U.S. 906 (2002) (internal quotation marks omitted.)  In the context of an FCA claim, "protected conduct" consists of actions taken "in furtherance of" a qui tam action; that is, there must be a "nexus" between the conduct and the potential federal action.  Hutchins, 253 F.3d at 187 (internal citations, quotations and alterations omitted.)  As discussed in Hutchins and reiterated in Dookeran v. Mercy Hosp. of Pittsburgh, 281 F.3d 105, 108 (3d Cir. 2002), the concept of acts "taken in furtherance" of a FCA action does not require the employee to have actually filed a FCA suit in order to assert claim of retaliation under § 3730 nor even to have developed a "winning FCA case."  Hutchins, id. at 187-188, see also Dookeran, id.  Courts do, however, "require that there at least be a distinct possibility that a viable FCA action could be filed."  Dookeran, 281 F.3d at 108, citing cases.

The second part of the Hutchins test also has two prongs.  The employee must show (1) the employer knew he had engaged in some

34

Case 2:11-cv-00116-WLS Document 14 Filed 09/15/11 Page 35 of 38

activity in furtherance of a FCA action and (2) the "retaliation was motivated, at least in part, by the employee's engaging in that protected activity." United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 736 (D.C. Cir. 1998) (internal quotation and alteration omitted.) That is, as the Hutchins Court succinctly stated, the employer has to have been put on notice of the "distinct possibility" of FCA litigation. Hutchins, 253 F.3d at 188. This notice requirement "is essential because without knowledge an employee is contemplating a False Claims Act suit, there would be no basis to conclude that the employer harbored § 3730(h)'s prohibited motivation, i.e., retaliation." Id. at 186, n.7.

Plaintiff identifies only a single act which he claims was taken in furtherance of a FCA action, that is, he told Thar its actions were fraudulent because the pressure vessel was being operated illegally and the continuous extraction process did not work. As pointed out in Campion v. Northeast Utils, 598 F. Supp.2d 638 (E.D. Pa. 2009), the FCA "protects a wide variety of conduct, 'including investigation for, initiation of, testimony for, or assistance in,' an FCA claim, and '[d]etermining what activities constitute 'protected conduct' is a fact specific inquiry." Campion, 598 F. Supp.2d at 648, quoting Hutchins, 253 F.3d at 187. Section 3730 covers actions taken while the employee is "collecting information about a possible fraud, before he has put all the pieces of the puzzle

together." Campion, id. at 657, quoting Hutchins, id. at 187-188.
The act of assembling the puzzle can include "internal reporting and
investigation of an employer's false or fraudulent claims," but does
not extend so far as to include investigation "of nothing more than
his employer's non-compliance with federal or state regulations."
Campion, id. (internal citations omitted.) Thus, although
Plaintiff alleges he repeatedly advised Thar management that he
believed the use of the pressure vessel was a violation of local,
state and federal law, as pointed out in Campion, investigation of
what an employee believes to be non-compliance with the law is
insufficient. Moreover, allegations that Thar had fraudulently
misrepresented the technical capabilities of the pressure vessel and
continuous extraction process when seeking federal funds rest
entirely on Mr. Quint's subjective beliefs. "An employee's
subjective belief that his employer is committing fraud in
insufficient by itself to trigger the protections of the FCA's
retaliation provision." Mann v. Heckler & Koch Def., Inc., 639 F.
Supp.2d 619, 641-642 (E.D. Va. 2009). Although the Third Circuit
Court of Appeals has not spoken directly on this issue, the Fourth
Circuit has held that an employee's investigation of his employer's
activities does "not rise to the level of protected activity until
the employee uncovered likely fraud, thereby making litigation a
reasonable possibility." Eberhardt v. Integrated Design & Const.,

Inc., 167 F.3d 861, 869, n.2 (4th Cir. 1999); *see also* Dookeran, 281 F.3d at 108, *citing* Eberhardt for the proposition that there must "at least be a distinct possibility that a viable FCA action could be filed." Plaintiff here fails to point to a single concrete example of "likely fraud" which he discovered, thus failing to allege a critical component of a claim under the FCA.

The only other action the Court can identify in the Amended Complaint that might fall within the ambit of "protected conduct" is the allegation that Plaintiff began reviewing reports Thar had filed with "federal agencies" about the pressure vessel for "fraudulent reporting." (Am. Compl., ¶ 32.) He alleges he was let go after he expressed his "concerns that misrepresentations had been made to the federal agencies charged with administering the Advanced Technology Program." (Id., ¶ 35.) He does not allege that he told anyone at Thar he was investigating the reports for evidence of possible fraud, nor does he allege that he advised anyone in Thar management he was intending to complain to those agencies about the company's purportedly fraudulent claims. In short, there is no factual allegation to support the conclusion that at any time, Thar was "on notice of the 'distinct possibility' of litigation" because Mr. Quint fails to allege any activity on his part "revealing the intent to report or assist the government in the investigation of a False Claims Act violation." *See* Hutchins, 253 F.3d at 189. Count

37

II of the Amended Complaint is therefore dismissed for failure to state a claim.

An appropriate Order follows.

September ___15___, 2011                _William L. Standish_____

                                        William L. Standish
                                        United States District Judge